FLOTA MERCANTE DOMINICANA, C. POR A., Owner of the S/S SANTO DOMINGO, Plaintiff,

v.

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, Defendant.

No. 66 Civ. 1651.

United States District Court
S. D. New York.
June 30, 1967.

Zock, Petrie, Sheneman & Reid, New York City, for plaintiff, Francis J. O'Brien, Howard M. McCormack, George D. Byrnes, New York City, of counsel.

Hepburn & Troy, New York City, for defendant, William P. Hepburn, William J. Troy, New York City, of counsel.

## MEMORANDUM

FRANKEL, District Judge.

This is an action on a policy of war-risk insurance to recover for the asserted constructive total loss of plaintiff's vessel the S/S Santo Domingo. The case is ready for partial or complete disposition on motions by both sides for summary judgment. The key issue now joined may be stated simply without peeling off the "layer upon layer of warranties and riders," Calmar Steamship Corp. v. Scott, 345 U.S. 427, 430, 73 S.Ct. 739, 741, 97 L.Ed. 1125 (1953), in which nautical insurers choose to enshroud this subject. That question is whether, on facts which are not in dispute, the claimed loss was outside the policy's coverage because of an exclusionary warranty reading as follows:

> "Warranted free from any claim arising from capture, seizure, arrest, restraint, detainment, preemption, confiscation or requisition by the Government of the United States or of the country in which the vessel is owned or registered or of the country in which any such right of requisition is vested."

Urging that the question must be answered affirmatively, defendant has moved for summary judgment dismissing the complaint. Plaintiff, recognizing other hurdles to a complete recovery, moves to strike certain defenses and for partial summary judgment confirming its contrary view of the quoted warranty and determining some other questions to be noticed below.

Since the court has concluded that plaintiff is correct on the main question presented, it is appropriate as well as convenient to proceed from defendant's summary of the undisputed facts. As formulated by defendant in its Statement pursuant to our local General Rule 9(g), they are as follows:

> "1. The contract of war-risk insurance of S/S SANTO DOMINGO issued by defendant to plaintiff, Policy OE 9865, contained a clause *excluding* from coverage *claims arising* from certain acts of the United States Government, to wit: capture, seizure, arrest, restraint, detainment, preemption, confiscation or requisition.

> "2. The master of the S/S SANTO DOMINGO, despite hostilities then occurring in the city of Santo Domingo, Dominican Republic, entered that port on April 29, 1965, moored his vessel to a harbor pier and left the ship, leaving the remainder of the crew or a part thereof on board.

> "3. Subsequently, police forces loyal to the Dominican Government boarded

and seized the vessel. After they left armed rebels boarded and, on May 4, 1965, directed small arms and automatic weapon fire upon an element of the 82nd Airborne Division, U.S. Army. Small arms fire from the U. S. troops failed to halt the rebel fire.

"4. At that time the 82nd Airborne Division, U. S. Army, and other U. S. armed forces, occupied parts of the city of Santo Domingo pursuant to carrying out orders of the President of the United States to protect U. S. Nationals.

"5. Lt. Col. George E. Pickett, IV, U. S. Army, Battalion Commander of the troops under fire from the ship received orders through regular official channels from the Commanding General of all U. S. Military Forces in Santo Domingo, to fire upon the ship with a 106 mm recoilless rifle.

"6. In compliance with these orders one round of 106 mm explosive projectile was fired into the bridge structure on May 4, 1965, starting a fire which continued to burn for at least two days and gutted the vessel.

"7. On May 5, 1965, firing from the vicinity of the S/S SANTO DOMINGO on U.S. forces was again observed and a second 106 mm projectile was aimed at and hit a point slightly above the water line.

"8. An additional reason for the 106 mm fire was that Lt. Col. George E. Pickett, IV, U. S. Army, and his Brigade Commander, Col. Robert F. Bayard, U.S. Army, both observing the vessel at that time, saw armed rebels removing from the ship boxes having the size and shape of ammunition boxes and their characteristic rope handles at the ends.

"9. The second firing of a 106 mm projectile was ordered by Col. Robert F. Bayard, Brigade Commander, pursuant to the same orders stated above for the firing on May 4th, and was ordered despite the fact that the Brigade Commander saw uniformed firemen on the ship fighting the fire still burning from the day before.

"10. The second explosion of a 106 mm projectile, on May 5, 1965, drove everyone, rebels, firemen and crew, if any, from the ship, which shortly thereafter broke away from her moorings, drifted across the river and sank to the bottom with only part of the main deck and superstructure above water.

"11. The U.S. Army officers who gave and carried out the orders stated above were agents of the U. S. Government acting within the scope of their authority and in furtherance of the purposes of the United States and the national interest thereof as determined by the President.

"12. The plaintiff's claim for damage to the S/S SANTO DOMINGO is a claim arising from capture, seizure, arrest, restraint, detainment, preemption, confiscation or requisition by the U.S. Government and is excluded from coverage by the terms of the policy."

It will be observed that the twelfth and last of these "fact" statements is, of course, the conclusion of law for which defendant contends. It is also noteworthy that in this statement of its position, the insurer, claiming an exclusion from the coverage it sold, invokes the eight excepting words *disjunctively*. This approach is repeated several times in defendant's lengthy brief. It is fair to say that defendant never in its extensive submissions commits itself to any one of the eight excepting words. Instead, its effort is to show that any one or some or several, or their combinations, or emanations from the whole group, must or can somehow be read to achieve the claimed exclusion from coverage.* The court concludes, however,

---

* For example, defendant writes (Memorandum in Support of Defendant's Motion for Summary Judgment, p. 17):
  "Taking the eight words singly can it be questioned SANTO DOMINGO was subjected to a 'restraint'? A 'detainment'? In any realistic meaning of the

that the undisputed circumstances of the ship's loss fall outside the clause whether its eight operative words are read singly or in combination.

■ There is no profit in lengthening this opinion by reviewing the court's sojourns in lay and legal dictionaries. It is sufficient to say that the firing of two shells into the Santo Domingo to end the hostile attacks from those aboard her was in no acceptable sense of the words either a "capture," "seizure," "arrest," "restraint," "detainment," "preemption," "confiscation" or "requisition" of the vessel. The American troops had no interest in effecting the kind of *possession*, physical or constructive, which is obviously central to the notions of "capture," "seizure," "preemption," "confiscation" and "requisition." Similarly, they were not concerned with the kinds of inhibition of movement entailed in "arrest," "restraint" and "detainment." The undisputed facts, as summarized in defendant's Statement and amplified by deposition testimony submitted by defendant, make it plain that the soldiers of the United States would have been entirely content to have the ship go away and cease serving as a source of dangerous gunfire.

■ The unsoundness of defendant's position seems plain enough as a matter of simple English from examination of the eight excepting words alone. This conclusion is buttressed by other language of the war-risk rider, which covered generally "the risks of hostilities or warlike operations," including damages suffered from "weapons of war * * *." The quoted words comfortably embrace the risk encountered by the Santo Domingo. The most obvious perils brought to mind by "warlike operations" are those of weapons capable of crippling or destroying. In defendant's sense, such disablement amounts to a "restraint" or a "capture" or something of the sort, but nobody uses the quoted words that way. As defendant would read them, the eight

words of the exclusionary clause would substantially exhaust the range of "warlike operations" by forces of the United States. But there was a brief and obvious way of saying that if it had been intended. It was not said in the specific words of exclusion invoked by defendant.

The case for defendant's novel construction of the disputed language is lengthened but not helped by the authorities it cites. The first of these, for example, The Claveresk, 264 F. 276 (2d Cir. 1920), involving construction of a charter party, makes the hardly surprising point that a "formal requisitioning letter" (p. 278) of the British Government could be deemed a "restraint of princes" within the contract language there involved. Dole v. New England Mutual Marine Ins. Co., 7 Fed.Cas.No. 3,966 (C.C.D.Mass.1884), so far as pertinent, teaches that "capture"—a "forcible seizure" and "taking" (p. 845)— means "capture." Olivera v. Union Insurance Company, 16 U.S. (3 Wheat.) 183, 193, 4 L.Ed. 365 (1818), shows that a blockade is a "restraint." Greene v. Pacific Mutual Insurance Co., 91 Mass. 217 (1864), from which defendant extracts general words of little use here, held that the taking of a ship by its mutinous crew, because it was "barratry," was not a "seizure" exempting the insurer from liability. See, also, National Union Fire Ins. Co. v. Republic of China, 254 F.2d 177 (4th Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958). The other cases cited by defendant, likewise venerable and stirring in their facts, have been considered. They fail to sustain the unlikely meaning defendant would attach to the words limiting its liability.

■ It is scarcely necessary to add that these words of exclusion should, if doubtful, "be interpreted most favorably to the insured * * *." Forster v. Insurance Co. of North America, 139 F.2d 875, 876 (2d Cir. 1944). There "cannot be much doubt" (*ibid.*) that defendant's

words was she not 'confiscated', and 'requisitioned'? She was possessed and destroyed in one hostile act."

For reasons stated in the text, the rhetorical questions require answers contrary to the ones they invite.

construction is wrong. The warranty it invokes is no defense to plaintiff's claim.

Accordingly, plaintiff's motion is granted to the extent of striking defendant's "Fourth Separate and Special Defense," which rests upon the foregoing exclusionary warranty. In addition, it is recorded, and made part of the court's order, that defendant has orally conceded abandonment of its defenses (1) based upon plaintiff's alleged fraud, (2) questioning that the Santo Domingo became a constructive total loss because of the above-described damage from American gunfire, and (3) disputing that plaintiff's "sue and labor" costs of $38,000 comprised a reasonable and recoverable expense under the policy. Except as thus granted or conceded, plaintiff's motion is denied. Defendant's motion for summary judgment is also denied.

It is so ordered.