**ISBELL ENTERPRISES, INC., Plaintiff,**

v.

**CITIZENS CASUALTY COMPANY OF NEW YORK, Defendant,**

v.

**MARINE MART, INC., Third-Party Defendant.**

**Civ. A. No. 68–B–50.**

United States District Court
S. D. Texas,
Brownsville Division.

Sept. 10, 1969.

Storter, Carinhas & Cunningham, Jack G. Carinhas, Jr., Brownsville, Tex., for plaintiff.

Adams, Graham, Lewis, Jenkins & Briscoe, Gordon L. Briscoe, Harlingen, Tex., for defendant.

Hardy & Sharpe, Benjamin S. Hardy, Brownsville, Tex., for third-party defendant.

GARZA, District Judge.

## MEMORANDUM

This is an in personam suit based upon an admiralty and maritime claim pursuant to Rule 9(h), Federal Rules of Civil Procedure.

The Plaintiff, Isbell Enterprises, Inc., sued Defendant, Citizens Casualty Company of New York, upon a hull policy of marine insurance.

The Plaintiff is attempting to recover for the constructive total loss of its fishing vessel CAPTAIN CRACKER.

The Defendant, Citizens Casualty Company of New York, is the insurance carrier for the CAPTAIN CRACKER, and Policy Number M50–10516 was in effect at the time of the loss.

Defendant Citizens interpleaded Third-Party Defendant, Marine Mart, Inc.

The Plaintiff and Third-Party Defendant are both Texas corporations. The Defendant Citizens is a New York state based company.

The following is a summary of the facts developed at the trial, leading up to the loss and subsequent suit:

On or about January 9, 1968, the CAPTAIN CRACKER, a fishing vessel, returned to Port Isabel, Texas, from an unsuccessful shrimping trip.

At the time, the crew consisted of Angel Gomez, captain, Delbert Storey and Julio Puente, rigmen, and Bernardo Estrada, header.

On January 10, 1968, Captain Gomez reported to Plaintiff's general manager, Mr. Elliff, that there were two small holes in the stern hull of the CAPTAIN CRACKER, just above the waterline.

Elliff inspected the damage and thereafter, with the consent of Ansell Isbell, President of Plaintiff, contacted Mr. Zimmerman who worked for Third-Party Defendant, Marine Mart, Inc., about making repairs on the CAPTAIN CRACKER.

Marine Mart, Inc., is a corporation which both repairs and builds fishing trawlers.

Before the incident in question, Marine Mart, Inc., had performed almost all of Plaintiff's repair work and had built five new trawlers for Plaintiff since 1964.

On January 11, 1968, the Plaintiff delivered the CAPTAIN CRACKER to Marine Mart's repair yard. One Tomas Portugal navigated the CAPTAIN CRACKER. Portugal usually navigated Plaintiff's boats to and from Marine Mart because of his familiarity with the channel.

The previously mentioned crew members were also aboard when the delivery was made. The CAPTAIN CRACKER was tied alongside the BARTO NO. II, another one of Plaintiff's boats being repaired at Marine Mart.

Three customary lines held the CAPTAIN CRACKER to the dock.

Marine Mart's trawler WONDERING BOY was docked astern of the other two boats.

Bernardo Estrada, with the approval of Captain Gomez, Elliff and Portugal, remained aboard the CAPTAIN CRACKER.

This procedure was customary when a shrimper had no place to stay or was short of funds.

Estrada had no duties except to be somewhat of a night watchman when he was there, as Marine Mart had no watchman.

Estrada was under no duty to stay aboard, and could come and go at will.

Estrada had no right to move or navigate the CAPTAIN CRACKER or supervise the repairs.

Marine Mart had no objection to crew members staying aboard the vessels while repairs were in progress.

On the afternoon of January 11, 1968, Marine Mart's employees Juan Hurtado, Sr., and Juan Hurtado, Jr., started repairs on the CAPTAIN CRACKER.

Later that afternoon, Elliff and Zimmerman jointly inspected the CAPTAIN CRACKER. Elliff had a short conversation with Estrada, but noticed nothing unusual.

The two Hurtados also observed Estrada that afternoon and thought he acted deranged. The Hurtados failed to advise anyone of their suspicion.

Later the same day, Portugal was aboard the CAPTAIN CRACKER and saw Estrada, but noticed nothing unsual.

Upon finishing their day's work, the Hurtados left their welding equipment upon board the CAPTAIN CRACKER because they had not finished the repairs.

At 7:00 a. m. the next day, January 12th, the Hurtados returned to the CAPTAIN CRACKER to complete the repairs.

When the Hurtados arrived on board, they noticed that the engine of the CAPTAIN CRACKER was running and that their equipment had been thrown overboard into the water.

The Hurtados found Estrada in a bunk with his head in his hands and acting unusual.

When asked why he had thrown the equipment overboard, Estrada replied because he was hungry and wanted to go fishing.

Estrada helped the Hurtados retrieve their equipment.

Shortly after this, Zimmerman told the Hurtados to stop work on the CAPTAIN CRACKER because of bad weather. The Hurtados were sent to work on the BARTO II because the work was inside out of the bad weather which prevailed on that day.

It was raining and high winds were blowing.

A few minutes later, the Hurtados and Zimmerman noticed that this man Estrada was at the controls of the CAPTAIN CRACKER, with the engines running.

Two of the lines had been released and the boat was swaying forward and backward. The CAPTAIN CRACKER scrap-

ed against the BARTO II, but caused no serious damage.

Zimmerman, being worried about the unusual behavior of the CAPTAIN CRACKER and the bad weather, was afraid other trawlers in the yard would be damaged.

Zimmerman inquired of the Hurtados if the CAPTAIN CRACKER was going fishing. The Hurtados replied that the man (Estrada) said he wanted to go fishing.

Zimmerman then cut the remaining line holding the CAPTAIN CRACKER, and the trawler left the yard.

Zimmerman made no effort to ascertain anything from Estrada, and did not call Isbell or Elliff. The Hurtados never told Zimmerman of Estrada's strange behavior.

About a half hour later, Elliff came to Marine Mart to inspect the repairs, and discovered the vessel was gone.

Elliff immediately contacted the Coast Guard who refused to give chase without a warrant. By the time a warrant was obtained, Estrada was already heading for Mexican waters.

The idea of a chase was abandoned because of Estrada's head start, the bad weather, and possible danger if Estrada was armed.

Elliff immediately notified the Defendant's agent in Jacksonville, Florida, of the occurrence.

On January 12, 1968, the CAPTAIN CRACKER went aground and sank off the coast of Mexico some 180 miles south of Port Isabel.

The CAPTAIN CRACKER was a constructive total loss and insured value was $20,000.00.

The Plaintiff also expended some $203.32 in locating the CAPTAIN CRACKER.

Estrada was later captured and was returned to the Cameron County jail. Subsequently Estrada was committed to a Texas mental institution in San Antonio, Texas.

The Plaintiff submitted a proof of loss to Defendant Insurance Company and a demand upon Third-Party Defendant, Marine Mart, Inc., for the loss of the CAPTAIN CRACKER.

Both Defendants have refused to admit liability. This lawsuit is a result of those refusals.

This Court must decide:

(1) If Defendant Citizens Casualty is liable for the loss of the CAPTAIN CRACKER;

(2) If Third-Party Defendant, Marine Mart, Inc., is liable for the loss of the CAPTAIN CRACKER; and

(3) If both defendants are found to be liable, what relationship they have to each other.

Each of these issues will be examined separately.

First, we examine the liability, if any, of Defendant, Citizens Casualty Company.

It is stipulated that the insurance policy in question was in full force and effect at the time of the loss, and that the premium had been paid.

The question then is, "Was the loss of the CAPTAIN CRACKER the result of a peril or perils insured against?"

Plaintiff is claiming coverage under several perils insured against. One of these perils is barratry. The Plaintiff is claiming that the loss of the CAPTAIN CRACKER was due to the barratrous acts of Estrada.

Barratry is an act committed by the master or mariners of a vessel for some fraudulent or unlawful purpose contrary to their duty to the owner and resulting in injury to the owner.

■ To constitute barratry it is necessary that the act be fraudulent or criminal, willful, and against the interests of the owner.

■ Barratry is one of the perils insured against by the policy in question.

Our evidence shows that one Bernardo Estrada was a crew member of the CAPTAIN CRACKER at the time of its loss.

As previously mentioned, Estrada had no authority to take the CAPTAIN CRACKER any place or even start the engine.

The evidence further shows that while the CAPTAIN CRACKER was in a yard being repaired, Estrada took the vessel out to sea in rough weather and proceeded into Mexican waters. Later the same day the CAPTAIN CRACKER went aground and sank some 180 miles south of Port Isabel, Texas, off the coast of Mexico.

This Court believes that the acts of Estrada on January 12, 1968, constituted barratry.

Estrada was a crew member of the CAPTAIN CRACKER who committed an illegal act (the taking of the vessel), wilfully (assumed by Estrada's actions), against the interests of the owner (the vessel was a total loss). Republic of China v. National Union Fire Ins. Co., D.C., 151 F.Supp. 211, 4 Cir., 254 F.2d 177, cert. den. 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64.

Defendant Citizens Casualty attempts to deny an act of barratry, claiming that Estrada was insane at the time of the taking and therefore could not have the necessary intent or wilfulness necessary to commit barratry.

■ Evidence was introduced at the time of trial concerning Estrada's mental condition at the time of the taking of the vessel. This Court has no doubt that Estrada was emotionally disturbed and suffering from some form of mental illness during the period in question. However, as is so often the case, a person can be mentally ill, even medically insane, and still not be legally insane thereby relieved of responsibility for his acts. The evidence does not establish that Estrada was legally insane.

Other evidence shows that Estrada, for whatever reason, formed an intent to take the CAPTAIN CRACKER out to sea, and that Estrada wilfully carried out that intention by taking the CAPTAIN CRACKER out to sea.

■ Even if insanity were a defense to barratry in this case, this Court feels other provisions of the policy would cover the loss in question.

This insurance policy has a clause which covers "all other like perils, losses, and misfortunes".

Estrada's acts, if not technically barratry, were enough like barratry to come within this provision of the insurance policy.

The case of Feinberg v. Insurance Company of North America, 260 F.2d 523 (1 Cir., 1958), in discussing "all other like perils", said:

> "We see no difficulty in giving some meaning to the "all other like perils" clause quoted above. It does not, of course, cover perils unlike those enumerated. But it does cover similar perils, or else it means nothing. We think the clause must have been included in the policy to serve a purpose and that its obvious purpose was to include in the policy all losses which, although perhaps not technically or strictly speaking covered in the specific perils enumerated, are losses very similar to or very much like the enumerated perils."

This Court feels that the loss of the CAPTAIN CRACKER is also covered by the "all other like perils" clause.

■ The Plaintiff also alleges coverage on the theory of "assailing thieves" and the "negligence of mariners" in the Inchmarie Clause.

The Court does not find liability on these two theories based upon the facts of this case.

Now, we turn our attention to the liability of Third-Party Defendant, Marine Mart, Inc.

As mentioned earlier, the CAPTAIN CRACKER was delivered to Third-Party Defendant, Marine Mart, Inc., for repairs on January 11, 1968. Upon delivery, the relationship of bailor-bailee was established between the Plaintiff Isbell and Defendant Marine Mart. The cases have consistently held that a shipyard becomes a bailee of an accepted vessel and

is charged with the duty of exercising ordinary care to protect the vessel against loss or damage. Erlbacher v. Republic Homes Corp., 263 F.2d 217 (8 Cir., 1959); Transit Casualty Co. v. United States, 239 F.Supp. 436 (S.D.Tex., 1965).

■■ The bailor has the burden of proof of negligence. The Plaintiff in this case met that burden by showing that it delivered the CAPTAIN CRACKER in good condition and that it was damaged while in the bailee's possession.

A prima facie case of negligence is then made and the bailee then has the duty to go forward with the evidence and show that he exercised ordinary care.

■ This Court feels that the Third-Party Defendant, Marine Mart, Inc., overcame this presumption by showing how the taking in fact occurred and that the taking was not attributable to its negligence.

Up to the point of taking, Third-Party Defendant, Marine Mart, Inc., exercised ordinary care and was not guilty of negligence.

The Hurtados, uneducated and unsophisticated, were hardly in a position to know if crewman Estrada was in fact deranged. His behavior was not so bizarre that action would have been taken by a person using ordinary care. Manager Zimmerman did not fail to use ordinary care by cutting the spring line, thereby releasing the CAPTAIN CRACKER.

Two of the lines were already untied, the weather was rough, and the CAPTAIN CRACKER was tossing about with its engines running, endangering the other boats.

The CAPTAIN CRACKER was far enough away from the dock that Zimmerman could not have gone aboard the CAPTAIN CRACKER to check the situation. Also, Estrada was a crew member of the CAPTAIN CRACKER and had been staying aboard during the repairs.

Therefore, under the evidence before this Court, Third-Party Defendant, Marine Mart, Inc., exercised ordinary care until the actual taking.

■ This Court does feel that Third-Party Defendant, Marine Mart, Inc., was guilty of negligence in failing to contact the Plaintiff after the taking.

The circumstances of the taking were such that a person using ordinary care would have checked with the owner of the vessel as to the nature and reason for the unusual procedure.

However, from the evidence before me, I cannot say that the negligence was the proximate cause of the loss of the CAPTAIN CRACKER.

In fact, I find that even if Third-Party Defendant, Marine Mart, Inc., had informed the Plaintiff of the taking, the loss could not have been prevented.

The Plaintiff discovered the taking about thirty minutes after its occurrence and was not able to recover the vessel. Estrada already had a head start. The Coast Guard would not act without an officer or United States marshal, and the officers would not act without a warrant. By the time the warrant was obtained, the CAPTAIN CRACKER was far away and would have been even with the added twenty minutes or so more Plaintiff would have had if Third-Party Defendant, Marine Mart, Inc., had contacted him.

There is no evidence of any faster boats available that could have overtaken the CAPTAIN CRACKER.

Also, the weather was very rough and the sea was dangerous.

Lastly, the Plaintiff feared that Estrada might have been armed and this was another factor in deciding not to pursue the CAPTAIN CRACKER.

Therefore, I find that the negligence of Third-Party Defendant, Marine Mart, Inc., was not the cause of the Plaintiff's loss.

The constructive total loss of the CAPTAIN CRACKER was due solely to the acts of crewman Estrada.

For reasons heretofore mentioned, Defendant Citizens Casualty is exclusively liable for said loss in the insured

amount of $20,000.00, plus the sue and labor expenses of $203.32.

Counsel for Plaintiff will prepare a judgment for entry in accordance with these Findings of Fact and Conclusions of Law.