**FISHING FLEET, INC.,**
Plaintiff-Appellee,

v.

**TRIDENT INSURANCE CO., LTD. and
Pike/Anco, Defendants-Appellants.**

No. 77–1524.

United States Court of Appeals,
Fifth Circuit.

July 11, 1979.

Rehearing Denied Sept. 5, 1979.

L. Glen Kratochvil, T. G. Schirmeyer, Houston, Tex., for defendants-appellants.

Paul Q. O'Leary, Brownsville, Tex., for plaintiff-appellee.

Before COLEMAN, GODBOLD and IN-GRAHAM, Circuit Judges.

GODBOLD, Circuit Judge:

This case involves the right of Fishing Fleet, the owner of the shrimp boat, the *Estoellen*, to recover for her loss under a marine insurance policy issued by Trident. The district court awarded Fishing Fleet the face amount of the insurance coverage, $30,000, on the theory that the total constructive loss of the *Estoellen* was caused by "barratry of the master." Trident attacks the judgment on the ground that barratry of the master was not proved and that, even if proved, recovery was barred by the contractual exclusion of liability for losses caused by government seizure of the boat (free of capture and seizure clause). Other issues raised by Trident include the insured's alleged concealment of material facts, its failure to diligently protect its interest in the *Estoellen* and the admissibility of Mexican government documents.[1]

---

1. For the first time on appeal Trident argues that as a matter of law there can be no constructive total loss unless the owner tenders abandonment to the insurer. The tender of abandonment issue is an affirmative defense which is waived if not properly raised in the trial court. *See* Fed.R.Civ.P. 8(c). An appellate court will consider an issue not raised below only "where a pure question of law is involved and a refusal to consider it would result in a miscarriage of justice." *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641, 658 n. 47 (CA5, 1974). In this case the tender of abandonment issue is not a pure question of law. Fishing Fleet does not contest the general principle that a tender of abandonment must normally be made to the insurer before there can be a total constructive loss. It is not an absolute prerequisite, however. *Rock Transport Properties Corp. v. Hartford Fire Ins. Co.*, 312 F.Supp. 341, 347 (S.D.N.Y.1970), *aff'd*, 433 F.2d 152 (CA2, 1970). A tender of abandonment to the insurer is not required "if it would be a futile act or an idle ceremony." *Id.* Whether a tender of abandonment would have been a futile act in this case is a question of

Fishing Fleet hired Frank Borsch to captain the *Estoellen* in late 1973. Borsch was given the necessary ship documents for processing with the Coast Guard, but never delivered them to the Coast Guard. As a result, Borsch never signed on as captain, and the prior captain, James Homan, was the captain of record at the time the *Estoellen* was lost.[2] Borsch made one successful fishing trip. The events which occurred during the second trip form the basis of this lawsuit.

Around the middle of November, the *Estoellen* set out on its second fishing trip with Borsch as captain. After an initial shrimp catch she put into Campeche, Mexico, to refuel and take on supplies. One of the crew members left the ship and returned to Brownsville, Texas, where he reported to the owners that he left because he "did not like the way things were going." By January 1974, the *Estoellen* was overdue and no shrimp had been received for Fishing Fleet's account from the *Estoellen*. Harold Dyke, a part owner of Fishing Fleet and its general manager, went to Campeche to investigate. Before leaving, Dyke told his insurance agent in Brownsville that he was concerned about the *Estoellen*. The insurance agent told Pike-Anco, Trident's insurance broker in Texas, that the vessel was or might be missing. Dyke found Borsch in Campeche and was told by him that the *Estoellen* had loaded 168 boxes of shrimp into a freezer boat known to be in the area. Borsch told Dyke that the *Estoellen* had been repainted and pointed the vessel out in the harbor. Dyke returned to Brownsville.

Back in Brownsville, Dyke discovered that Borsch had not loaded any shrimp onto a freezer boat. In February 1974 Dyke sent two employees, Cordoba and Garcia, to Campeche. They found the *Estoellen* sunk but in shallow water so that she was partly visible above water, with a hole in her port side. The boat had been towed into Campeche on February 12 by a Mexican vessel. When Cordoba and Garcia returned and

reported to Dyke, he informed his insurance agent of the condition of the *Estoellen*. Dyke did not return to Campeche because the insurance agent warned him that he might be detained in Mexico until charges accrued against the ship were paid. The district court found that the total charges were $40,783.51. The *Estoellen* is now owned by a Mexican national and registered under the name *Durango*.

As of February 13, 1974, the Mexican authorities could find no trace of either Borsch or the crew. Before Borsch disappeared, however, and before the *Estoellen* sank, Borsch made an unsuccessful attempt to sell her for $10,000.

## I. Barratry of the master

In *Marcardier v. Chesapeake Insurance Co.*, 12 U.S. (8 Cranch) 39, 3 L.Ed. 481 (1814), the Supreme Court defined barratry of the master as "an act committed by the master or mariners of a ship for some unlawful or fraudulent purpose, contrary to their duty to the owners, whereby the latter sustain an injury." *Id.* at 49, 3 L.Ed. at 484; *accord, Patapsco Insurance Co. v. Coulter*, 28 U.S. (3 Peters) 222, 7 L.Ed. 659 (1830). This court in *Commercial Trading Co. v. Hartford Ins. Co.*, 466 F.2d 1239 (CA5, 1972), approved the district court's conclusion that " 'in the absence of fraud, nothing but acts of known criminality, gross malversation, or the like can amount to barratry.' " *Id.* at 1244–45; *accord, National Union Fire Ins. Co. v. Republic of China*, 254 F.2d 177, 183 (CA4), *cert. denied*, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958) (" [Barratry] is a generic term which includes many acts of various kinds and degrees. It comprehends any unlawful, fraudulent or dishonest act of the master or mariners, and every violation of duty by them arising from gross and culpable negligence contrary to their duty to the owner . . . .' " (*quoting Greene v. Pacific Mutual Life Ins. Co.*, 91 Mass. 217, 220 (1864))); *Isbell Enterprises, Inc. v. Citizens Casualty*

---

fact. We decline to consider the issue first raised on appeal.

**2.** It turned out that Borsch was an illegal German immigrant.

*Co.*, 303 F.Supp. 549, 552 (S.D.Tex.1969), *aff'd on other grounds*, 431 F.2d 409 (CA5, 1970). Simple negligence of the captain or crew can never amount to barratry. *Commercial Trading Co. v. Hartford Fire Ins. Co., supra* at 1245; *Intermondale Trading Co. v. North River Ins. Co.*, 100 F.Supp. 128, 132 (S.D.N.Y.1951).

▆▆▆ Appellant claims that Fishing Fleet has failed to prove barratry as defined above.[3] We disagree. The evidence recited above points to gross malversation by Captain Borsch. He lied to Dyke about the loading of shrimp, fraudulently tried to sell the *Estoellen*, and once she sank, disappeared, failing to protect the owner's interest in her, a duty Borsch owed Fishing Fleet. We believe this is sufficient to constitute barratry of the master.

### II. Free of Capture and Seizure Clause

▆▆▆ The insurance policy provides that The following conditions shall be paramount and shall supersede and nullify any contrary provisions of the Policy. This Policy does not cover any loss, damage or expense caused by, resulting from, or incurred as a consequence of:

a. Capture, seizure, arrest, restraint or detainment, or any attempt, thereat; or

b. Any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise.

Trident argues that the total loss of the *Estoellen* resulted from her seizure by the Mexican authorities and that it is freed from liability under the F.C.&S. Clause. The district court found, however, and we agree, that the total constructive loss of the *Estoellen* was caused by the barratry of the master. The district court found that the total charges against the ship totaled over $40,000 at the time the vessel was seized. There was, therefore a total constructive loss before the seizure.

In *National Union Fire Insurance Co. v. Republic of China, supra*, the court stated that "[n]o case has come to our attention in which the barratrous conduct of either the master or the crew of a vessel has been held to be within the capture and seizure exclusion clause of a marine insurance policy." *Id.* at 185. Appellant argues that the district court opinion in *Intermondale Trading Co. v. North River Ins. Co., supra*, held that the F.C.&S. Clause is a complete defense to barratry of the master. In that case, however, the court concluded that there was no evidence of barratrous conduct. *Id.* at 132. There is no need to decide whether the F.C.&S. Clause can ever be a defense where there have been barratrous acts. Here, the *Estoellen* was a total constructive loss prior to seizure. The seizure was not the cause of the loss.[4]

### III. Concealment and Misrepresentation

▆▆▆ Appellant contends that Fishing Fleet intentionally concealed the fact that the *Estoellen* was scuttled in Campeche harbor, and that this alleged concealment is ground for avoiding the policy. Paragraph 2 of the "Certificate Conditions" of the policy provides that "[t]his entire Certificate shall be void if the Assured has concealed or misrepresented any material fact or circumstances concerning this insurance or the subject thereof or in the case of any fraud or false swearing by the Assured

---

**3.** Appellant argues that Fishing Fleet had to prove barratry of the master beyond a reasonable doubt. The argument is without merit. The case relied upon by appellant, *Northwestern Mutual Life Insurance Co. v. Linard*, 498 F.2d 556 (CA2, 1974), does not stand for the proposition that a scuttling case must be proved by the insured beyond a reasonable doubt. The issue in *Linard* was whether the underwriter or the shipowner has the burden of proving that there was a scuttling by a *preponderance of the evidence*. *Id.* at 560. Appellant

has extracted dicta out of context and tried to fashion a new rule of law from it.

**4.** Throughout its brief appellant states that the charges against the *Estoellen* prior to seizure totaled $11,600. The district court based its finding that the charges totaled over $40,000 on a marine surveyor's report. The surveyor was sent by Fishing Fleet to Campeche to investigate the loss of the *Estoellen*. The surveyor's report provided an adequate basis for the district court's finding that total charges exceeded $40,000.

touching any matter relating to this insurance or the subject thereof, whether before or after a loss." The district court found that Fishing Fleet's notice to its insurance agent of the events surrounding the loss of the *Estoellen* was sufficient to avoid a violation of paragraph 2 of the policy. After Cordoba and Garcia returned from Campeche with news that the *Estoellen* was sunk in shallow water, Fishing Fleet passed this information on to its insurance agent. Fishing Fleet, however, did not tell the insurance agent that it suspected that the *Estoellen* was intentionally scuttled.[5]

Fishing Fleet's failure to pass on its suspicion of an intentional scuttling is not grounds for avoiding the policy. Trident was held liable because of the barratry of the master. The finding of barratry was not premised on intentional scuttling of the *Estoellen*. Indeed, there was no finding that there was a scuttling. Nor did the failure of Fishing Fleet to pass on its suspicions contribute to the total constructive loss of the *Estoellen*. The insurance company was informed of the crucial facts surrounding the condition of the *Estoellen*. In these circumstances the insured's failure to provide the insurer with one of the possible causes of the loss of the ship is not cause for avoiding the policy.

### IV. Sue Labor and Travel

■ Under the Sue Labor and Travel Clause of the insurance policy the "assured has the duty  .   .   .   to exercise the care of a prudent uninsured owner to protect insured property in order to minimize or prevent the loss from the occurrence for which the underwriter would be liable under the policy." *Continental Food Products, Inc. v. Insurance Company of North America*, 544 F.2d 834, 837 n. 1 (CA5, 1977); *accord, Reliance Insurance Co. v. The Escapade*, 280 F.2d 482, 488 n. 11 (CA5, 1960). We agree with the district court that Fishing Fleet fulfilled this duty. In January 1974 Fishing Fleet's general manager trav-

eled to Campeche to ascertain the condition of the *Estoellen*. He also contacted Francis Withey, a retired foreign service officer of the United States State Department, at the end of January and asked him to do what he could to safeguard the *Estoellen*. Withey telephoned the Fisheries Attache at the U.S. Embassy in Mexico City and requested the Attache to contact the Mexican authorities, the port captain and local prosecutor, and inform them that Captain Borsch might try to illegally dispose of the *Estoellen*. In February, Fishing Fleet sent two of its employees to Campeche to investigate. At that point the *Estoellen* was already sunk. Fishing Fleet then contracted to send a marine surveyor to Campeche to assess the damages. Francis Withey, on behalf of the marine surveying company, traveled to Campeche to conduct the investigation. The surveyor's conclusion was that the total charges drawn by the *Estoellen* totalled over $40,000. These steps taken by the insured to protect its interest in the *Estoellen* were adequate to satisfy its duty under the Sue Labor and Travel Clause of the policy. Appellant's claim that Fishing Fleet intentionally abandoned the *Estoellen* to the Mexican government has no support in the record.

### V. Admissibility of Mexican documents

■ In support of the Marine Surveyor's report on the charges drawn by the *Estoellen*, the district judge admitted Mexican government documents. Appellant claims that these documents were inadmissible hearsay because they did not meet the requirements of Rule 902(3) for self authentication. We do not reach the merits of this argument because there was sufficient nonhearsay evidence to support the district court's finding of the charges drawn by the *Estoellen*. In a bench trial it is presumed that a district judge's findings are based on admissible evidence. *In re Multiponics, Inc.*, 453 F.2d 853, 855 (CA5, 1972); *U. S. v. 396 Corp.*, 264 F.2d 704, 709 (CA2), *cert.*

---

5. The boards around the hole in the bow of the ship were facing outward and a hammer and crowbar were found next to the hole.

*denied,* 361 U.S. 817, 80 S.Ct. 60, 4 L.Ed.2d 64 (1959). Francis Withey testified that based on his investigation of the *Estoellen* in Campeche he determined that the actual charges drawn by the ship totalled over $28,000. Manning Dierlam, head of the marine surveying company contracted by Fishing Fleet, testified that in his expert opinion it would have cost Fishing Fleet approximately $12,666 more to have retrieved the *Estoellen* from the Mexican authorities and make several additional necessary repairs. This testimony is adequate to support the district court's finding without relying on the Mexican documents.

AFFIRMED.